FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

2019 MAR 25 PM 3:50

UNITED STATES OF AMERICA

v.

CASE NO. 6:19-cr-57-Orl-41LRH

PAUL BANNON POWERS

15 U.S.C. §§ 78j(b) & 78ff;
17 C.F.R. §§ 240.10b-5 & 240.10b5-2.

## INFORMATION

The United States charges that:

### I. BACKGROUND

#### A. SeaWorld Entertainment, Inc.

1. SeaWorld Entertainment, Inc. ("SeaWorld") was a Delaware corporation, with its headquarters in Orlando, Florida. SeaWorld operated theme parks in Florida and elsewhere in the United States, including SeaWorld-branded parks in Florida, Texas, and California.

#### B. The Defendant

2. The Defendant, **PAUL BANNON POWERS**, was a licensed attorney, and a resident of Orlando, Florida. Until October 2018, **POWERS** was employed as SeaWorld's Associate General Counsel and Assistant Secretary, and worked at SeaWorld's headquarters in Orlando, Florida.

3. As SeaWorld's Associate General Counsel and Assistant Secretary, **POWERS** attended and took detailed notes of the meetings of SeaWorld's Revenue

and Audit Committees, and he regularly received advance copies of the materials that were discussed at such meetings, including material and confidential information about SeaWorld's financial performance.

4. By virtue of his position as Associate General Counsel and Assistant Secretary, **POWERS** owed a duty of trust and confidence to SeaWorld and to SeaWorld's shareholders.

C. SeaWorld Securities

5. SeaWorld's stock was publicly traded under the ticker symbol "SEAS" on the New York Stock Exchange, a national securities exchange, and was registered with the United States Securities and Exchange Commission (the "SEC"), an agency of the United States, pursuant to Section 12(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78l(b)). As a public company, SeaWorld and its directors, officers, and employees were required to comply with the federal securities laws, regulations, and rules. Among other things, SeaWorld was required to file quarterly reports ("SEC Forms 10-Q") with the SEC containing financial statements that accurately and fairly presented the financial condition of SeaWorld, as well as other reports about SeaWorld's management, Board of Directors, business operations, and performance. Through these reports, SeaWorld disclosed its financial information to the SEC, SeaWorld's shareholders, and the investing public.

## COUNT ONE
### Securities Fraud
(15 U.S.C. §§ 78j(b) & 78ff;
17 C.F.R. §§ 240.10b-5 & 240.10b5-2)

6. The allegations in paragraphs 1 through 5 are realleged and incorporated as if fully set forth here.

7. In or around August 2018, in the Middle District of Florida and elsewhere, the Defendant,

**PAUL BANNON POWERS,**

knowingly and willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and the facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed, and caused others to use and employ, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing, and causing others to employ, devices, schemes, and artifices to defraud; (b) making, and causing others to make, untrue statements of material fact and omitting to state, and causing others to omit to state, material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging, and causing others to engage, in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, on the basis of material, non-public information obtained from his employer, **POWERS** executed

and caused to be executed trades in the securities of SeaWorld.

All in violation of Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5 and 240.10b5-2.

## II. DESCRIPTION OF THE INSIDER-TRADING SCHEME

### A. The Defendant's Duties to SeaWorld

8. On or about August 5, 2013, SeaWorld notified **POWERS** in writing that he was a "Restricted Person" under SeaWorld's trading policies, and that as a Restricted Person he was allowed to trade shares of SeaWorld stock only during a "Window Period." In addition, under the same trading policies, SeaWorld notified **POWERS** that he was required to have any trades he wished to execute in shares of SeaWorld stock pre-approved by SeaWorld's General Counsel.

9. On or about May 8, 2018, **POWERS** received a letter from the SeaWorld legal department stating that the Window Period governing trading in shares of SeaWorld stock prior to the release of SeaWorld's SEC Form 10-Q would run from May 10 to June 15, 2018, meaning that **POWERS** was allowed to trade shares of SeaWorld stock only during that period. The letter further stated the following in bolded text: "After the close of the Window Period [*i.e.* June 15, 2018] . . . Restricted Persons may not purchase, sell or otherwise dispose of any of the Company's securities." On or about August 6, 2018, **POWERS** received a letter from the SeaWorld legal department stating that the Window Period for trading in SeaWorld stock would reopen on August 8, 2018, and remain open until September 14, 2018.

10. In sum, pursuant to SeaWorld's trading policies, **POWERS** was (1) required to obtain pre-approval from SeaWorld's General Counsel prior to executing any trades in SeaWorld stock, and (2) wholly prohibited from trading in shares of SeaWorld stock from June 15, 2018, when the Window Period closed, until August 8, 2018, when the Window Period reopened.

### B. The Defendant Gains Material and Confidential Information from his Employer

11. By at least June 2018, **POWERS** began receiving material and confidential information about SeaWorld's financial performance and upcoming non-public events, which **POWERS** knew would be released to the public on August 6, 2018 when SeaWorld filed its SEC Form 10-Q for the Second Quarter of 2018, including the following:

- On or about June 18, 2018, **POWERS** received materials prepared for an upcoming Revenue Committee meeting showing that SeaWorld anticipated both attendance and revenue to increase in the first half of 2018 by approximately 8% as compared to the first half of 2017. On or about June 20, 2018, **POWERS** attended a meeting of the Revenue Committee where the increase in attendance and revenue was discussed, and took notes of the meeting in his capacity as Assistant Secretary.

- On or about July 6, 2018, **POWERS** received materials prepared for an upcoming Revenue Committee meeting showing that SeaWorld

had achieved an 8% increase in attendance and an 8.7% increase in revenue in the first half of 2018 as compared to the first half of 2017. On or about July 9, 2018, **POWERS** attended a meeting of the Revenue Committee where the increase in attendance and revenue was discussed, and took notes of the meeting in his capacity as Assistant Secretary.

- On or about August 1, 2018, **POWERS** received materials prepared for an upcoming Audit Committee meeting that included a draft earnings release reporting the increased revenue and attendance figures for the first half of 2018, and also reporting that one of SeaWorld's key earnings metrics (earnings before interest, tax, depreciation, and amortization or "EBITDA") had improved 59.1% in the first half of 2018 as compared to the first half of 2017. In addition, **POWERS** received a draft SEC Form 10-Q reflecting that SeaWorld had "reached an agreement in principle with the [SEC Enforcement] Staff to settle, without admitting or denying, charges against [SeaWorld] arising out of the previously disclosed SEC investigation [and that SeaWorld] recorded an estimated liability of $4.0 million related to this matter." On August 3, 2018, **POWERS** attended a meeting of the Audit Committee where the draft earnings

release and SEC Form 10-Q were discussed, and took notes of the meeting in his capacity as Assistant Secretary.

### C. The Defendant Trades in the Securities of SeaWorld on the Basis of Material and Confidential Information

12. In order to obtain funds for the purpose of trading in shares of SeaWorld stock, on July 31, 2018, **POWERS** liquidated all of the equities in his personal TD Ameritrade account, realizing gross proceeds of approximately $387,795.

13. On August 2, 2018, **POWERS** used almost all of the proceeds from the July 31, 2018 transaction to purchase 18,000 shares of SeaWorld stock at a cost of approximately $385,592.

14. **POWERS** never sought pre-approval from SeaWorld's General Counsel prior to executing the trade to buy 18,000 shares of SeaWorld stock on August 2, 2018. In addition, when **POWERS** executed this trade, he was wholly prohibited from trading in SeaWorld stock under SeaWorld's trading policies.

15. **POWERS** nevertheless purchased 18,000 shares of SeaWorld on August 2, 2018 because he had gained material and confidential information about SeaWorld's positive financial performance that he knew SeaWorld would be reporting to the public on August 6, 2018.

16. On August 6, 2018, SeaWorld announced the better-than-expected attendance, revenue, and EBITDA results, which caused the price of SeaWorld shares to spike approximately 17%—from $21.13 per share at the close of trading on

Friday, August 3, 2018 to $25.40 per share when the market reopened on Monday August 6, 2018.

17. On the morning of August 6, 2018, **POWERS** entered an order to sell all 18,000 shares of his SeaWorld stock at market price, realizing gross proceeds of $450,237, and a net profit of approximately $64,645.

18. **POWERS** never sought pre-approval from SeaWorld's General Counsel prior to executing the trade to sell 18,000 shares of SeaWorld stock on August 6, 2018. In addition, when he executed this trade, **POWERS** was wholly prohibited from trading in SeaWorld stock under SeaWorld's trading policies.

## FORFEITURE

1. The allegations contained in Count One are incorporated by reference for the purpose of alleging forfeiture, pursuant to provisions of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

2. Upon conviction of the offense charged in this Information, the Defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, that constitutes or is derived, directly or indirectly, from proceeds traceable to the charged offense.

3. The property to be forfeited includes a money judgment against **PAUL BANNON POWERS** in the amount of $64,645 in United States currency, representing the amount of insider-trading proceeds obtained as a result of the

charged violation of Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

4. If, as a result of any act or omission of the defendant, any property subject to forfeiture:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property under the provisions of 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

ROBERT ZINK
Acting Chief, Fraud Section
U.S. Department of Justice

By: *[signature]*
HENRY P. VAN DYCK
Assistant Chief
MARK CIPOLLETTI
Trial Attorney
Criminal Division, Fraud Section
United States Department of Justice